**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| A.M., individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ADVANCED REPRODUCTIVE HEALTH CENTER, LTD. d/b/a CHICAGO IVF, | |
| Defendant. | |

Plaintiff A.M. ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant Advanced Reproductive Health Center, Ltd. d/b/a Chicago IVF ("Defendant" or "Chicago IVF"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit brought on behalf of all patients who accessed and used www.chicagoivf.com (the "Website") to book a consultation for fertility services.

2.      Fertility treatment can be a difficult journey—both physically and emotionally. Defendant knows that its patients expect the intimate details of their treatment to remain confidential. In an effort to reassure its patients that their information is protected, Defendant maintains a "Privacy Pledge" stating it will not "provide any of your health information to any outside marketing company."[1]

---

[1] CHICAGO IVF, *PRIVACY POLICY*, https://www.chicagoivf.com/privacy-policy.

3.      Despite that promise, Chicago IVF aided, employed, agreed, and conspired with Meta Platforms, Inc. ("Facebook")[2] to intercept sensitive and confidential communications sent and received by Plaintiff and Class Members, including communications related to their reproductive health.

4.      Defendant aided in these unlawful disclosures without Plaintiff and Class Members' knowledge or consent.

5.      Plaintiff brings this action on behalf of herself and the Class (as defined below) for equitable relief and to recover damages and restitution for: (i) violation of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2511(1), *et seq.*; (ii) violation of the Illinois Eavesdropping Statute ("IES") 720 Ill. Comp. Stat. 5/14, *et seq.*, and (iii) negligence.

## PARTIES

6.      Plaintiff is an Illinois citizen who resides in Manhattan, Illinois.  Plaintiff was in Illinois when she booked a consultation for fertility services using Defendant's Website in 2021. Due to the surreptitious nature of the disclosures at issue, Plaintiff was not aware that her confidential communications had been disclosed by Defendant until around July 2024.

7.      Plaintiff attended her consultation and received services related to fertility treatment[3] from Defendant.

8.      During the time Plaintiff used the Website, she maintained an active Facebook account.  Plaintiff used the same device to access the Website and her Facebook account. Subsequently, as a result of the conduct of Defendant, she received targeted advertisements on

---

[2] In October 2021, Facebook, Inc. changed its name to Meta Platforms, Inc. Unless otherwise indicated, Facebook, Inc. and Meta Platforms, Inc. are referenced collectively as "Facebook."

[3] To prevent further disclosure of Plaintiff's confidential medical information, Plaintiff has not included in her allegations the precise nature of the treatment she received from Chicago IVF.

Facebook relating to fertility services.

9.     Pursuant to the systemic process described herein, Defendant assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII") and protected health information ("PHI"). This includes information related to the specific fertility treatment she received with Chicago IVF. Defendant assisted Facebook's interceptions without Plaintiff's knowledge, consent, or express written authorization.

10.    By failing to receive the requisite consent, Defendant breached its duty of confidentiality and aided Facebook in unlawfully intercepting Plaintiff's PII and PHI.

11.    Such acts are an egregious violation of Plaintiff's right to privacy.

12.    Defendant Chicago IVF is an Illinois corporation with its principal place of business in Skokie, Illinois. Defendant owns and operates the website www.chicagoivf.com. Defendant provides in-person fertility services and treatment at clinics located in Illinois and Indiana. Defendant embedded a software code known as the Facebook Tracking Pixel on its Website, as described in more detail below. Defendant embedded this tracking technology on its Website for advertising purposes.

## JURISIDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq* ("ECPA").

14.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds

$5,000,000 exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendant because Defendant resides in this District.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District and Defendant resides in this District.

## FACTUAL ALLEGATIONS

### A.     Reproductive Health Information is Sensitive and Confidential

17.     Defendant assisted Facebook with intercepting information that is sensitive, confidential, and personally identifiable.

18.     Fertility clinics provide medical treatment to individuals experiencing health issues related to or causing infertility.

19.     The decision to seek reproductive health care, including fertility treatment, is sensitive and confidential.  As Illinois Attorney General Kwame Raoul stated, "[w]omen have a right to use web-based tools to seek reproductive health care without worrying that their data or location is being shared with third parties."[4]

20.     Not only is this information sensitive and confidential, it is legally protected by state and federal law.

21.     In 1994, Illinois passed the Medical Patient Rights Act ("MPRA") with the

---

[4] *Attorney General Raoul Urges Individuals To Protect Their Digital Privacy When Seeking Reproductive Care Or Information,* ILL. ATT'Y GEN. 1 (July 15, 2022), https://illinoisattorneygeneral.gov/News-Room/2022-Press-Release-Archive/202207-15%20CONSUMER%20ALERT%20RAOUL%20URGES%20INDIVIDUALS%20TO%20PROTECT%20THEIR%20DIGITAL%20PRIVACY%20WHEN%20SEEKING%20REPRODUCTIVE%20CARE%20OR%20INFORMATION.pdf

purpose "to establish certain rights for medical patients and to provide a penalty for the violation thereof." 410 ILCS 50/1. The MPRA codified "the right of each patient to privacy and confidentiality in health care." 410 ILCS 50/3(d). This section further provides that "[e]ach physician, health care provider, health care services corporation and insurance company shall refrain from disclosing the nature or details of services provided to patients." *Id.*

22. In 2020, the MPRA was amended to protect the reproductive privacy rights of women, stating that "every woman has the following rights with regard to pregnancy and childbirth…the right to privacy and confidentiality of records[.]"[5]

23. Thus, Illinois law requires all fertility clinics, including Chicago IVF, to maintain information related to fertility treatment within their control as confidential.

24. Federal law has similar requirements. Under HIPAA, a healthcare provider may not disclose PII or PHI without the patient's express written authorization.[6]

25. The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[7]

26. A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health

---

[5] Pub. Act 101-0445, 410 ILCS 50/3.4.

[6] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[7] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html

identifier; [or] (2) obtains individually identifiable health information relating to an individual."[8]

27.     The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization."  *Id.*

28.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to its patients.

29.     Defendant further failed to comply with other HIPAA safeguard regulations as follows:

   a.     Failing to ensure the confidentiality and integrity of electronic PHI that Chicago IVF created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

   b.     Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

   c.     Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Chicago IVF in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

   d.     Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

---

[8] 42 U.S.C. § 1320d-6.

e.     Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f.     Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

30.     Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools, such as the Facebook Tracking Pixel, *in a limited way* to perform analysis on data key to operations.  They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors.  As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.  **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**.[9]

31.     The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others.  For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.  Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive**

---

[9] HHS.gov, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (the "Bulletin") (emphasis added), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.[10]**

32.     Plaintiff and Class Members face exactly the risks about which the government expresses concern.  Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members scheduling consultations on the Website.

33.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, **or any unique identifying code**.[11]

34.     Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.  This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.[12]

35.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps

---

[10] *Id.* (emphasis added).

[11] *Id.* (emphasis added).

[12] *Id.* (emphasis added).

that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.[13]

36.     Therefore, Defendant's conduct, as described more thoroughly below, is directly

contrary to federal law and the clear pronouncements by the FTC and HHS.

---

[13] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

### B.    Facebook's Platform and Business Tools

37.    Facebook describes itself as a "real identity platform,"[14] meaning users are allowed only one account and must share "the name they go by in everyday life."[15]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[16]

38.    In 2023, Facebook generated over $134 billion in revenue.[17]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[18]

39.    Facebook sells advertising space by highlighting its ability to target users.[19] Facebook can target users effectively because it surveils user activity on and off its site.[20]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[21]  Facebook compiles this information into a

---

[14] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL ST. J. (Oct. 21, 2021, 4:05 PM), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[15] Facebook, Community Standards, Part IV Integrity and Authenticity, https://www.facebook.com/communitystandards/integrity_authenticity.

[16] FACEBOOK, SIGN UP, https://www.facebook.com.

[17] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS; INITIATES QUARTERLY DIVIDEND, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend-2024.pdf at 8.

[18] *Id.*

[19] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[20] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[21] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[22]

40.     Advertisers can also build "Custom Audiences."[23]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[24]  With Custom Audiences, advertisers can target existing customers directly and build "Lookalike Audiences," which "leverage[] information such as demographics, interests and behaviors from your source audience to find new people who share similar qualities."[25]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: (1) by manually uploading contact information for customers or (2) by utilizing Facebook's "Business Tools."[26]

41.     As Facebook puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[27]   Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and

---

[22] FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[23] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[24] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[25] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[26] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494;
FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[27] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

42.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[28]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[29]  Advertisers can even create their own tracking parameters by building a "custom event."[30]

43.    One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Chicago IVF, to integrate into their website.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[31]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Facebook's servers.  This second secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Tracking Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent

---

[28] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[29] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[30] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, META for DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[31] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Chicago IVF's Website— Chicago IVF's own code and Facebook's embedded code.

44.     Defendant chose to include the Facebook Tracking Pixel on its Website.

45.     Facebook's own documentation makes clear how extensively the Facebook Tracking Pixel tracks private information.  It describes the Facebook Tracking Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people[] [and] *[f]ind . . . people who have visited a specific page or taken a desired action on your website*" (emphasis added).[32]

46.     Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel**, *the pixel will log when someone takes an action on your website*.  Examples of actions include adding an item to their shopping cart or making a purchase. *The Pixel receives these actions, or events,* which you can view on your [Facebook Tracking] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. *You'll also have options to reach those customers again through future Meta ads*.[33]

47.     Of course, in healthcare, it is medical specialists that users "add to their shopping cart."  They book fertility consultations rather than make purchases.

48.     The Facebook Tracking Pixel code enables Facebook not only to help Chicago IVF with advertising to its own patients outside the Website, but also includes individual patients among groups targeted by other Facebook advertisers relating to the conditions about which patients communicated on Chicago IVF's Website.

49.     Facebook's Business Help Center explains:

---

[32] Meta, About Meta Pixel, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[33] *Id.* (emphasis added).

Meta *uses event data to show ads to people who are likely to be interested in them.* One type of marketing data is website events, which are *actions that people take on your website.*[34]

50.     In other words, Facebook sells advertising space by highlighting its ability to target users.[35]  Facebook can target users so effectively because it surveils user activity both on and off its site.[36]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and connections.[37]

51.     An example illustrates how the Facebook Tracking Pixel works.  Take an individual who, at relevant times, navigated to Chicago IVF's Website and clicked on a link to book a fertility consultation.  When that link was clicked, the individual's browser sent a GET request to Chicago IVF's server requesting that server to load the particular webpage.  As a result of Chicago IVF's use of the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sent secret instructions back to the individual's browser, without alerting the individual that this was happening.  Facebook caused the browser to secretly duplicate the communication with Chicago IVF, transmitting it to Facebook's servers, alongside additional information that transcribed the communication's content and the individual's identity.

52.     After collecting and intercepting the information described in the preceding paragraph, Facebook processed, analyzed, and assimilated it into datasets like Core Audiences

---

[34] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[35] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706

[36] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[37] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

and Custom Audiences.

### C.     Defendant Assisted Facebook With Intercepting It's Patients PII and PHI

53.     Through the Facebook Tracking Pixel, Defendant shared its patients' identities and online activity, including confidential information related to individuals seeking fertility treatment, to the largest social media company in the world for targeted advertising purposes.

54.     Defendant Chicago IVF allows and encourages consumers to book consultations for fertility treatment on its Website.

**Figure 1:**



55.     When consumers select "schedule a consult," they are brought to another page on Defendant's Website where they are asked to provide PII in advance of their consultation for fertility treatment.

56.     Unbeknownst to consumers, Defendant assists Facebook in intercepting information related to the fertility treatment sought by its patients.

**Figure 2:**



57.     As shown in Figure 2, this includes information that a patient is seeking treatment for IUI fertility services.  Similar transmissions will occur depending on the type of fertility treatment sought by Defendant's patients (e.g., in-vitro-fertilization, etc).

58.     After a patient confirms their consultation appointment with Defendant, Facebook receives that information as well.

**Figure 3:**



16

59.     Specifically, a "Lead" event indicates to Facebook that "a sign up is completed."[38]

60.     Each time Defendant sent this activity data through the Facebook Tracking Pixel, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID"). An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

61.     A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted FID.

62.     When a visitor's browser had recently logged out of an account, Facebook compelled the visitor's browser to send a smaller set of cookies.

63.     One such cookie was the "fr cookie" which contained, at least, an encrypted FID and browser identifier.[39] Facebook, at a minimum, used the fr cookie to identify users.[40]

64.     If a visitor had never created an account, an even smaller set of cookies was transmitted.

65.     At each stage, Defendant also utilized the "_fbp cookie," which attached to a

---

[38] Meta, https://developers.facebook.com/docs/meta-pixel/reference/

[39] Data Protection Commissioner, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[40] Facebook, Privacy Center – Cookies Policy, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

browser as a first-party cookie, and which Facebook used to identify a browser and a user.[41]

66.  The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[42]  Otherwise, the c_user cookie is cleared when the browser exits.[43]

67.  The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[44]  If that happens, the time resets, and another 90 days begins to accrue.[45]

68.  The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[46]  If that happens, the time resets, and another 90 days begins to accrue.[47]

69.  The Facebook Tracking Pixel used both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant's Website.[48]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[49]  The _fbp cookie was always transmitted as a first-party cookie.  A duplicate _fbp cookie was sometimes sent as a third-party cookie, depending on whether the browser had recently logged into Facebook.

70.  Facebook, at a minimum, used the fr, _fbp, and c_user cookies to link to FIDs and

---

[41] *Id.*

[42] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[43] *Id.*

[44] *See id.*

[45] Confirmable through developer tools.

[46] FACEBOOK, PRIVACY CENTER – COOKIES POLICY, https://mbasic.facebook.com/privacy/policies/cookies/printable/#annotation-1.

[47] Also confirmable through developer tools.

[48] PC MAG, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[49] PC MAG, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

corresponding Facebook profiles. Defendant sent these identifiers alongside the event data.

71.     Plaintiff's offsite activity report from her personal Facebook account confirms that her sensitive, confidential, and protected information was intercepted by Facebook through Defendant's Website.

72.     Such disclosures violate state and federal law, as well as Defendant's own Privacy Pledge to its patients.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff seeks to represent a class defined as all persons in the United States who, during the class period, had a Facebook account and booked a consultation on www.chicagoivf.com (the "Class").

74.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

75.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

76.     Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

77.     **Numerosity.**  The members of the proposed Class are geographically dispersed

throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are thousands of individuals that are members of the proposed Class. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Class are known by Defendant. Members of the Class may be notified of the pendency of this action by mail and/or publication through the records of Defendant and third-party Facebook.

78.     **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, scheduled a consultation on Defendant's Website for fertility treatment.  The representative Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in the very same way as the members of the Class through the privacy violations alleged herein.  Further, the factual bases of Defendant's misconduct are common to all members of the Class and represent a common thread of misconduct resulting in injury to all members of the Class.

79.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual questions include, but are not limited to, the following:

    a.  Whether Defendant intentionally tapped the lines of internet communication between patients and their fertility healthcare provider;

    b.  Whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to Facebook;

    c.  Whether Facebook is a third-party eavesdroppers;

d.  Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e.  Whether Defendant's conduct, which allowed Facebook—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f.  Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Facebook Tracking Pixel to record and communicate patients' confidential medical communications; and

g.  Whether Defendant breached its duty owed to Plaintiff and the Class by disclosing their PII and PHI to Facebook.

80.     **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Plaintiff has no interests that are antagonistic to those of the Class.

81.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Class are relatively small compared to the burden and expense of individual litigation of her claims against Defendant.  It would, thus, be virtually impossible for members of the Class, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Class could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or

contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

82. In the alternative, the Class may be certified because:

(a) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede her ability to protect her interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511(1),** *et seq.*

83. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

84. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

85. The ECPA protects both sending and the receipt of communications.

86. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or

electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

87.     The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

88.     The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

89.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

90.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

91.     The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

92.     The following instruments constitute "devices" within the meaning of the ECPA:

a.      The computer codes and programs Facebook used to track Plaintiff and Class Members communications while they were navigating the Website;

b.      Plaintiff's and Class Members' browsers;

    c.      Plaintiff's and Class Members' mobile devices;

    d.      Defendant and Facebook's web and ad servers;

    e.      The plan Defendant and Facebook carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

93.    Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

94.    By utilizing and embedding the Facebook Tracking Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

95.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications through the Facebook Tracking Pixel, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, such as Facebook.

96.    Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their Facebook ID and treatment information.  This confidential information was then monetized for targeted advertising purposes.

97.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

98.     By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

99.     Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

100.     The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[50]

101.     Plaintiff's information that Defendant disclosed to Facebook qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.

---

[50] 42 U.S.C. § 1320d-6.

Defendant used the wire or electronic communications to increase its profit margins. Defendant specifically used the Facebook Tracking Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

102.     Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

103.     Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Facebook Tracking Pixel. Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Facebook without their knowledge or consent.

104.     The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

105.     As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II
### Negligence

106.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

107.     Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

108.     As a provider of health care under the law, Defendant had a special relationship

with Plaintiff and Class Members who entrusted Defendant to adequately protect their PII and PHI.

109.   Defendant knew that the PII and PHI at issue was private and confidential and should be protected as private and confidential, as evidenced by the Privacy Pledge made to its patients.  Thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of unauthorized disclosure.

110.   Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI and allowing it to be accessed by unauthorized third parties.

111.   Defendant's failure to take proper security measures to protect Plaintiff's and Class Members' PII and PHI created conditions conducive to a foreseeable risk of unauthorized access and disclosure of such confidential information to unauthorized third parties. As described above, Plaintiff and Class Members are part of a foreseeable, discernable group that was at high risk of having their confidential information compromised, and otherwise wrongly disclosed if not adequately protected by Defendant.

112.   Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

113.   Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

114.   Defendant systematically failed to provide adequate security for data in its possession or over which it had supervision and control.

115.   Defendant, through its actions and omissions, unlawfully breached duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding

Plaintiff's and Class Members' PII and PHI within Defendant's possession, supervision, and control.

116. Defendant, through its actions and omissions, unlawfully breached duties owed to Plaintiff and Class Members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class Members' PII and PHI.

117. Defendant, through its actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class Members that the PII and PHI within Defendant's possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

118. Defendant's breach of duties owed to Plaintiff and Class Members proximately caused Plaintiff's and Class Members' PII and PHI to be compromised by being accessed by unauthorized third parties.

119. As a result of Defendant's ongoing failure to adequately notify Plaintiff and Class Members regarding what type of PII and PHI has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages.

120. As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

121. In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty

of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

122. Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Class, that the Court enter judgment in her favor and against Defendant as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: August 21, 2024               Respectfully Submitted,

By: *_/s/ Stephen A. Beck_*
     Stephen A. Beck

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
       sbeck@bursor.com

*Attorneys for Plaintiff*