**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| A.M. and J.K., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ADVANCED REPRODUCTIVE HEALTH CENTER, LTD. d/b/a CHICAGO IVF,<br><br>Defendant. | Case No. 24-cv-07559<br><br>(consolidated with 24-cv-07644) |

**DEFENDANT'S ANSWER TO THE COMPLAINT**

Defendant Advanced Reproductive Health Center, Ltd. d/b/a Chicago IVF ("ARHC"), by and through its undersigned counsel, respectfully files this Answer to the Putative Class Action Complaint (ECF No. 27, the "Complaint") of Plaintiffs A.M. and J.K. as follows:

ARHC denies all allegations in the Complaint except to the extent expressly admitted herein. Because the figures, headings, footnotes, and exhibits in and attached to the Complaint are not allegations, ARHC does not respond to them. To the extent a response to the figures, headings, footnotes, and exhibits is necessary, ARHC denies the allegations contained in any figures, headings, footnotes, and exhibits.

ARHC's responses herein are made upon information and belief and may change subject to further investigation. Numbered paragraphs below correspond to the like-numbered paragraphs in the Complaint.

## INTRODUCTION

1. Fertility treatment can be a difficult journey—both physically and emotionally. One in eight couples has trouble getting pregnant or carrying a pregnancy, and 7.4 million women have received infertility treatment. Despite the prevalence of infertility, information concerning fertility and reproductive health is among the most confidential and sensitive information in our society. According to a recent study, most infertile women choose to keep their struggle private from family or friends.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 1 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

2. Regarding the need to keep information about reproductive health private, the Department of Health and Human Services ("HHS") has noted:

> A positive, trusting relationship between individuals and their health care providers is essential to an individual's health and well-being. The prospect of releasing highly sensitive PHI can result in medical mistrust and the deterioration of the confidential, safe environment that is necessary to quality health care, a functional health care system, and the public's health generally. That is even more true in the context of reproductive health care, given the potential for stigmatization and other adverse consequences to individuals resulting from disclosures they do not want or expect.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 2 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

3. The mishandling of such private and sensitive health information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical and fertility treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized

entities is vitally necessary to maintain public trust in the healthcare system as a whole.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 3 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

4. Defendant Chicago IVF provides fertility treatment to couples seeking to start a family. Defendant has locations throughout the Chicagoland area and provides treatments such as artificial insemination, in vitro fertilization, and genetic testing.

**ANSWER:** In response to Paragraph 4 of the Complaint, ARHC admits the allegations.

5. As part of the medical services it provides, Chicago IVF owns, controls and maintains a website for its clinic, https://www.chicagoivf.com (the "Website").

**ANSWER:** In response to Paragraph 5 of the Complaint, ARHC admits that it owns, controls and maintains the Website. The remaining allegations are denied.

6. Defendant Chicago IVF actively encourages patients and prospective patients to use the Website, to communicate with their healthcare providers; manage medical appointments for fertility services; search medical conditions concerning fertility conditions and treatment options. The Website invites patients to share and search for personal medical information about their own reproductive health. And patients, trusting that this extremely private and sensitive information will be safeguarded, share intimate and personal medical information with Chicago IVF through the Website.

**ANSWER:** Paragraph 6 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

7. Defendant knows that its patients expect the intimate details of their treatment to remain confidential. In an effort to reassure its patients that their information is protected, Chicago

IVF proclaims to its patients in its "Privacy Policy" that "[w]e want you to understand that we respect your privacy. Other than the necessary uses and disclosures we described above, we will not sell your health information or provide any of your health information to any outside marketing company." But Defendant does not live up to its promises.

**ANSWER:** Paragraph 7 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Privacy Policy speaks for itself. The remaining allegations are denied.

8. Unbeknownst to Plaintiffs and Class Members, Defendant installed tracking technologies, including, but not limited to, the Meta Pixel (the "Pixel"), Google Analytics, and Google Tag Manager, (collectively, "Tracking Technologies") on its Website to collect and disclose its Private Information to unauthorized third parties for its own pecuniary gain. The collection and transmission of this information is instantaneous, invisible and occurs without any notice to—and certainly no consent from—the Users.

**ANSWER:** Paragraph 8 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

9. The Meta Pixel, installed and configured by Defendant, is a piece of code that "tracks the people and [the] type of actions they take" as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box).

**ANSWER**: In response to Paragraph 9, ARHC states that the Website speaks for itself. The remaining allegations are denied.

10. The Pixels—which are configured by the website owners, here, Chicago IVF—collect and transmit information from Users' browsers to unauthorized third parties, including, but not limited to, Facebook.

**ANSWER**: Paragraph 10 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

11. Together with the patients' Private Information, the data sent to Facebook also discloses Users' unique and persistent Facebook ID ("Facebook ID" or "FID") which allows Facebook and other third parties to personally identify those Users and associates their Private Information with their Facebook profile.

**ANSWER**: Paragraph 11 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

12. Simply put (and as detailed herein), healthcare providers such as Defendant are not permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third party without express and informed consent from each patient. Neither Plaintiffs nor any other Class Members were provided—much less signed—a written authorization permitting Defendant to disclose their Private Information to Facebook or any other third-party data brokers.

**ANSWER:** Paragraph 12 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

13. Plaintiffs and Class Members who visited and used Chicago IVF's Website ("Users") reasonably believed that they were communicating only with their trusted healthcare providers.

**ANSWER:** Paragraph 13 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

14. At no point has Defendant, despite intentionally incorporating invisible tracking code from unauthorized third parties into its Website, informed Users that their personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") communicated via its Website was intentionally disclosed to a third party—let alone Facebook, which has a sordid history of privacy violations.

**ANSWER:** Paragraph 14 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Privacy Policy and Website speaks for itself. The remaining allegations are denied.

15. As recognized by both the Federal Trade Commission ("FTC") and the Office for Civil Rights ("OCR") of HHS, healthcare companies' use of tracking technologies to collect and divulge their patients' sensitive and confidential information is an extremely serious data security and privacy issue:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers. In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 15 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

16. Similarly, the OCR is clear that "[r]egulated entities [those to which HIPAA

applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the Health Insurance Portability and Accountability Act ("HIPAA") Rules."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 16 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

17. There is no anonymity in the information disclosed to Facebook; that is, the Pixel collects and discloses a substantial "data packet" coupled with the FID so that Defendant can, among other things, send targeted advertisements to Users based on their sensitive and protected Private Information. Defendant also uses this impermissibly obtained data for analytics purposes to gain additional insights into how its patients use its Website.

**ANSWER**: Paragraph 17 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

18. Operating as designed and as implemented by Defendant, the Pixel disclosed information that allows a third party (e.g., Facebook) to know when and where a specific patient was seeking confidential medical care, the medical condition(s) that patients inquired about, and the precise care the patient sought or received. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers who target Plaintiffs' and Class Members' Facebook accounts based on that Private Information.

**ANSWER**: Paragraph 18 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

19. While the information captured and disclosed may vary depending on the pixel(s)

embedded, these "data packets" can be extensive, sending, for example, the user's first name, last name, email address and phone number entered on the website. The data packets can also include the buttons a user clicks and the exact words a user types into a search bar.

**<u>ANSWER</u>:** There are no factual allegations directed at ARHC in Paragraph 19 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

20. The data in the "data packets" is then linked to the Users' Facebook ID.

**<u>ANSWER</u>:** There are no factual allegations directed at ARHC in Paragraph 20 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

21. For instance, when a User uses Defendant's Website where Tracking Technologies, such as the Meta Pixel are present, the Pixel transmits the contents of their communications to Facebook, including, but not limited to: (i) information about medical reproductive and fertility services and treatments; (ii) patient status; (iii) searches for specific doctors; (iv) the text of URLs visited by the User; (v) requests to make an appointment; and (vi) other information that qualifies as PII and PHI under federal and state laws.

**<u>ANSWER</u>**: Paragraph 21 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

22. By installing the Meta Pixel and other Tracking Technologies, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and caused them to unknowingly disclose their private, sensitive and confidential health-related communications to Facebook (and other third-party data brokers).

**<u>ANSWER</u>**: Paragraph 22 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself.

The remaining allegations are denied.

23. The information intercepted by the Pixels and third-party tracking technologies is used to build incredibly fulsome and robust marketing profiles for individual Users and create targeted advertisements based on the medical conditions and other Private Information. Despite the clear and unequivocal prohibition on the disclosure of PHI without consent, Chicago IVF chose to use the Pixel data for marketing purposes to bolster its revenue.

**ANSWER**: Paragraph 23 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

24. Simply put, Defendant put its desire for revenue over its patients' privacy rights.

**ANSWER**: The allegations within Paragraph 24 are denied.

25. As a healthcare provider, Defendant has certain duties and obligations to its patients. Defendant breached those duties and obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web Users' information; (iii) failing to obtain the consent of Plaintiffs and Class Members to disclose their PII and PHI to Facebook or other third parties; (iv) failing to take steps to block the transmission of Plaintiffs' and Class Members' PII and PHI through the Pixels; (v) failing to warn Plaintiffs and Class Members about the tracking technology present on the Website; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient PII and PHI.

**ANSWER**: Paragraph 25 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself.

The remaining allegations are denied.

26. Plaintiffs and Class Members have suffered injury because of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) compromise and disclosure of Private Information; (iv) diminution of value of their Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.

**ANSWER:** Paragraph 26 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

27. Plaintiffs seek to remedy these harms for themselves and a class of all others similarly situated for: (i) Violation of Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*. (the "ECPA"), Unauthorized Interception, Use and Disclosure; (ii) Negligence; (iii) Unjust Enrichment; and (iv) Violation of the Illinois Eavesdropping Statute, 720 ILCS § 5/14-1, *et. seq*.

**ANSWER**: Paragraph 27 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

**PARTIES**

28. Plaintiff A.M. is, and has been at all relevant times, a resident of the city of Manhattan, Illinois.

**ANSWER:** In response to Paragraph 28 of the Complaint, ARHC lacks information sufficient to answer the allegations related to Plaintiff A.M.'s residency.

29. Plaintiff J.K. is, and has been at all relevant times, a resident of the city of Plainfield in Will County, Illinois.

**ANSWER:** In response to Paragraph 29 of the Complaint, ARHC lacks information

sufficient to answer the allegations related to Plaintiff J.K.'s residency.

30. Defendant Chicago IVF is a corporation organized under the laws of Illinois with its principal place of business at 5225 Old Orchard Road, Suite 21, Skokie, in Cook County in the state of Illinois

**ANSWER:** In response to Paragraph 30 of the Complaint, ARHC admits the allegations.

**JURISDICTION & VENUE**

31. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the claims that arise under 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

**ANSWER:** Paragraph 31 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

32. This Court also has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

**ANSWER:** Paragraph 32 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

33. The Court has personal jurisdiction over Defendant Chicago IVF because its principal place of business and headquarters are located in Skokie, in Cook County, Illinois, it regularly engages in business in the State of Illinois and in Cook County and a substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this county.

**ANSWER:** Paragraph 33 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

34. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant that led to the unauthorized sharing of Plaintiffs' and Class Members' Private Information; Defendant's principal place of business is located in this District; Defendant collects and redistributes Class Members' Private Information in this District and Defendant caused harm to Class Members residing in this District.

**ANSWER:** Paragraph 34 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

## PLAINTIFFS' ALLEGATIONS

***Plaintiff A.M.***

35. Plaintiff A.M. accessed and used the Chicago IVF Website through her computer and mobile devices while located in Illinois to seek medical treatment as recently as July 2021.

**ANSWER:** ARHC lacks information to admit or deny the allegations contained in Paragraph 35 of the Complaint.

36. Plaintiff A.M. attended her consultation and received services related to fertility treatment from Defendant.

**ANSWER:** ARHC lacks information to admit or deny the allegations contained in Paragraph 36 of the Complaint.

37. Plaintiff A.M. used Defendant's Website to, among other things, search for a doctor, search for clinic locations, pay for medical services, schedule appointments, use the Patient Portal, and search for information regarding treatments and conditions for infertility, including for

intrauterine insemination.

**ANSWER:** ARHC lacks information to admit or deny the allegations contained in Paragraph 37 of the Complaint.

38. Information that Plaintiff A.M. provided to Defendant via its Website included queries about her medical conditions as well as for testing, diagnosis and treatments for intrauterine insemination.

**ANSWER**: Paragraph 38 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

***Plaintiff J.K..***

39. Plaintiff J.K. accessed and used the Chicago IVF Website through her computer and mobile devices while located in Illinois to seek medical treatment as recently as 2021.

**ANSWER:** ARHC lacks information to admit or deny the allegations contained in Paragraph 39 of the Complaint.

40. Plaintiff J.K. has been a patient of Chicago IVF since approximately 2019 where she received in vitro fertilization treatment.

**ANSWER:** ARHC lacks information to admit or deny the allegations contained in Paragraph 40 of the Complaint.

41. Plaintiff J.K. began using Defendant's Website in 2019 to, among other things, search for a doctor, search for clinic locations, pay for medical services, schedule appointments, use the Patient Portal, and search for information regarding treatments and conditions for infertility, including in vitro fertilization treatments.

**ANSWER:** ARHC lacks information to admit or deny the allegations contained in Paragraph 41 of the Complaint.

42. Information that Plaintiff J.K. provided to Defendant via its Website included queries about her medical conditions as well as for testing, diagnosis and treatments for in vitro fertilization.

**ANSWER**: Paragraph 42 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

43. Plaintiffs both maintained active Facebook accounts during the time they provided their Private Information to Defendant via its Website.

**ANSWER**: Paragraph 43 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC lacks information to admit or deny whether Plaintiffs maintained active Facebook accounts. The remaining allegations are denied.

44. After Plaintiffs provided information to Defendant regarding their Personal Information, Plaintiffs both began receiving advertisements on their Meta accounts (Facebook and/or Instagram) for other fertility clinics that provide fertility treatment.

**ANSWER**: Paragraph 44 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC lacks information to admit or deny whether Plaintiffs received advertisements on their Meta accounts (Facebook and/or Instagram) for other fertility clinics that provide fertility treatment. The remaining allegations are denied.

45. Plaintiffs reasonably expected that their communications with Defendant via the Website were confidential, solely between themselves and Defendant, and that such communications would not be transmitted to or intercepted by any third party without their full knowledge and informed consent.

**ANSWER:** Paragraph 45 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required,

ARHC denies the allegations.

46. Plaintiffs provided their Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

**ANSWER:** Paragraph 46 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

47. As described herein, Defendant worked along with Facebook to intercept Plaintiffs' communications, including those that contained confidential Private Information, while Plaintiffs were within the state of Illinois.

**ANSWER:** Paragraph 47 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

48. Defendant willfully facilitated these interceptions without Plaintiffs' knowledge, consent or express written authorization.

**ANSWER:** Paragraph 48 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

49. Within the State of Illinois, Defendant transmitted Plaintiffs' FID, computer IP address, location, information such as medical treatments and conditions, the scheduling of appointments, information on physician(s) she selected and her sensitive and private medical information to Facebook.

**ANSWER:** Paragraph 49 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

50. The full scope of Defendant's interceptions and disclosures of Plaintiffs'

communications to Meta can only be determined through formal discovery. However, Defendant intercepted at least the following communications about Plaintiffs' past or present patient status, medical conditions (treatment for infertility and use of in vitro fertilization), treatments sought, and the locations for receipt of healthcare, via the following long-URLs or substantially similar URLs that were sent to Meta via the Pixel and which contain information concerning Plaintiffs' specific medical conditions, queries, and treatments sought:

- https://www.chicagoivf.com/fertility-treatment/iui-artificial-insemination
- https://chicagoivf.securepayments.cardpointe.com/pay
- https://portal.chicago-ivf.com/PatientPortal
- https://www.chicagoivf.com/locations/fertility-clinics/naperville-western-chicagosuburbs
- https://www.chicagoivf.com/about/fertility-specialists/natalie-schultz-md

**ANSWER:** Paragraph 50 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

51. By doing so without their consent, Defendant breached Plaintiffs' right to privacy and unlawfully disclosed their Private Information.

**ANSWER:** Paragraph 51 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

52. Defendant did not inform Plaintiffs that it shared their Private Information with Facebook.

**ANSWER:** Paragraph 52 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

53. Plaintiffs suffered damages in, inter alia, the form of (i) invasion of privacy; (ii) violation of confidentiality of their Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

**ANSWER:** Paragraph 53 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

54. Plaintiffs have a continuing interest in ensuring that their Private Information is protected and safeguarded from future unauthorized disclosure. Plaintiffs want to continue to communicate through online platforms but have no practical way of knowing if their communications are being intercepted and disclosed to Facebook, and thus continues to be at risk of harm from Defendant's conduct.

**ANSWER:** Paragraph 54 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

## COMMON FACTUAL ALLEGATIONS

### *A. Defendant Installed and Configured Facebook Tracking Technologies on its Website.*

55. Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 55 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

56. In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify,

target, and market products and services to individuals.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 57 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

57. Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, thereby enabling the interception and collection of website visitors' activity.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 57 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

58. Specifically, the Pixel "tracks the people and type of actions they take." When a user accesses a webpage hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers. Notably, this transmission does not occur unless the webpage contains the Pixel.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 58 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

59. The Pixel is customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 59 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

60. The process of adding the Pixel to webpages is a multi-step process that must be undertaken by the website owner.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 60 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

61. Facebook guides the website owner through setting up the Pixel during the setup process. Specifically, Facebook explains that there are two steps to set up a pixel: "(1) Create your pixel and set up the pixel base code on your website. You can use a partner integration if one is available to you, or you can manually add code to your website. (2) Set up events on your website to measure the actions you care about, like making a purchase. You can use a partner integration, the point-and-click event setup tool, or you can manually add code to your website."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 61 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

62. Aside from the various steps to embed and activate the Pixel, website owners, like Defendant, must also agree to Facebook's Business Tools Terms by which Facebook requires website owners using the Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing and usage of data through Facebook's Business Tools (including the Pixel) and that websites "will not share Business Tool Data . . . that [websites] know or reasonably should know . . . includes health, financial information or other categories of sensitive information . . . ."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 62 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

63. Stated differently, Plaintiffs' and Class Members' Private Information would not have been disclosed to Facebook but for Defendant's decisions to install the Pixel on its Website.

**ANSWER:** Paragraph 63 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

64. As explained in more detail below, this secret transmission to Facebook is initiated

by Defendant's source code concurrently with Plaintiffs' and Class Members' communications to their intended recipient, Defendant.

**ANSWER:** Paragraph 64 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

***B. Defendant Assisted Third Parties in Intercepting Patients' Communications with its Website and Disclosed Their Private Information to Third Parties.***

65. Defendant's Website is accessible on mobile devices and desktop computers and allows patients to communicate with Defendant regarding their medical care.

**ANSWER:** Paragraph 65 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

66. Defendant encouraged patients to use its Website to communicate their Private Information, schedule appointments, access information about their treatments, pay medical bills and more.

**ANSWER:** Paragraph 66 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

67. Despite this, Defendant purposely installed Tracking Technologies on its Website and programmed specific webpage(s) to surreptitiously share its patients' private and protected communications, including Plaintiffs' and Class Members' PHI and/or PII, which was sent to Facebook, Google and other third parties.

**ANSWER:** Paragraph 67 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself.

The remaining allegations are denied.

68. The Tracking Technologies followed, recorded and disseminated patients' information as they navigated and communicated with Defendant via the Website, simultaneously transmitting the substance of those communications to unintended and undisclosed third parties.

**ANSWER:** Paragraph 68 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

69. The information disseminated by the Tracking Technologies and/or intercepted by third parties constitutes Private Information including medical information patients requested or viewed, the title of any buttons clicked (such as the "Services" drop down page which identifies and communicates the specific medical conditions and treatments of a patient), the exact phrases typed into text boxes, selections made from drop-down menus or while using filtering tools and other sensitive and confidential information, the divulgence of which is and was highly offensive to Plaintiffs.

**ANSWER:** Paragraph 69 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

70. This is PHI because the webpages have access to "information that relates to any individual's past, present, or future health, health care, or payment for health care."

**ANSWER:** Paragraph 70 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

71. The information collected and disclosed by Defendant's Tracking Technologies is

not anonymous and is viewed and categorized by the intercepting party on receipt.

**<u>ANSWER</u>:** Paragraph 71 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

72. The information Facebook received via the Tracking Technologies was linked and connected to patients' Facebook profiles (via their Facebook ID or "c_user id"), which includes other PII.

**<u>ANSWER</u>:** Paragraph 72 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

73. Similarly, Google stores users' logged-in identifier on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or nonprivate browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and nonprivate) within the same logs and uses this data to serve personalized ads.

**<u>ANSWER</u>:** There are no factual allegations directed at ARHC in Paragraph 73 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

74. Simply put, the health information that was disclosed via the Tracking Technologies is personally identifiable and was sent alongside other persistent unique identifiers such as the patients' IP address, Facebook ID and device identifiers.

**<u>ANSWER</u>:** Paragraph 74 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

### *C. Defendant's Method of Transmitting Plaintiffs' & Class Members' Private Information via Tracking Technologies.*

75. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (computer, tablet or smartphone) accesses web content through a web browser (e.g., Google's Chrome, Mozilla's Firefox, Apple's Safari, and/or Microsoft's Edge browsers).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 75 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

76. Every website is hosted by a computer "server" that holds the website's contents. The entity(ies) in charge of the website exchange communications with users' devices as their web browsers query the server through the internet.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 76 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

77. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses, and any given browsing session may consist of thousands of individual HTTP requests and HTTP responses, along with corresponding cookies:

1. **HTTP request:** an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF to file a motion to a court.)

2. **Cookies:** a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP requests from client devices to the host server. Some cookies are "third-party cookies," which

means they can store and communicate data when visiting one website to an entirely different website.

3. **HTTP response:** an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 77 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

78. A patient's HTTP request essentially asks Defendant's Website to retrieve certain information (such as a set of health screening questions). The HTTP response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons and other features that appear on the participants' screens as they navigate Defendant's Website.

**ANSWER:** Paragraph 78 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

79. Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 79 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

80. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 80 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

81. The Pixels are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding Pixel Information Recipient, much like a traditional wiretap.

**ANSWER:** Paragraph 81 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

82. For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Pixels).

**ANSWER:** Paragraph 82 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

83. Thus, Defendant is, in essence, handing its patients a tapped website and, once a webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Pixels, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Facebook or another corresponding Pixel Information Recipient.

**ANSWER:** Paragraph 83 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

84. Third parties like Facebook place cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the

information intercepted (in this case, highly sensitive Private Information).

**ANSWER:** Paragraph 84 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

85. For example, Facebook uses cookies named c_user, datr, fr and fbp to identify Users. Facebook stores or updates Facebook-specific cookies every time a person accesses their Facebook account from the same web browser.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 85 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

86. The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 86 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

87. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 87 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

88. A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can

easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 88 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

89. The Facebook datr cookie identifies the User's web browser. It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 89 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

90. The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 90 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

91. A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

**ANSWER:** Paragraph 91 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

92. At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

**ANSWER:** Paragraph 92 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

93. Defendant sent these identifiers with the Users' "event" data.

**ANSWER:** Paragraph 93 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

94. Defendant intentionally configured Pixels installed on its Website to capture both the "characteristics" of individual patients' communications with its Website (their IP addresses, Facebook ID, cookie identifiers, device identifiers, emails and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to their fertility-related health conditions and services sought from Defendant).

**ANSWER:** Paragraph 94 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

95. This disclosed PHI and PII allows Facebook to know that a specific patient is seeking confidential medical care and the type of medical care being sought, and in addition to permitting Defendant to target those persons with Defendant's ads, Facebook also then sells that information to marketers who will online target Plaintiffs and Class Members.

**ANSWER:** Paragraph 95 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

96. Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook:

a. Plaintiffs' and Class Members' status as medical patients;

b. Plaintiffs' and Class Members' communications with Defendant through its Website, including medical conditions for which they sought treatments and treatments sought;

c. Plaintiffs' and Class Members' searches for doctors;

d. Plaintiffs' and Class Members' contacting Defendant and making appointments for medical care; and

e. PII, including but not limited to patients' locations, IP addresses, device identifiers, individual's unique Facebook ID and other unique personal identifiers.

**ANSWER:** Paragraph 96 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

97. Through the Website, Defendant shares its patients' identities and online activity, including information and search results related to their private medical treatment.

**ANSWER:** Paragraph 97 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

98. For example, when they visit the Website, Chicago IVF patients can search fertility treatments by selecting the "Fertility Treatments" menu which takes them to a list of services offered by Chicago IVF. Patients are then directed to a variety of sensitive fertility treatments, including, for example "in-vitro-fertilization."

**ANSWER:** Paragraph 98 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

99. The User's selections and filters are transmitted to Facebook via the Meta Pixels,

even if they contain the User's treatment, procedures, medical conditions, or related queries, without alerting the User, and the images below confirm that the communications Defendant Chicago IVF sends to Facebook contain the User's Private Information and personal identifiers, including but not limited to their Facebook ID, IP address, fbp, datr and fr cookies, along with the search filters the User selected.

**ANSWER:** Paragraph 99 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

100. Here, the search parameters set by the patient and the patient's FID number are being shared together, thereby allowing Facebook to make the direct connection between the search parameters and each individual patient's FID. Even without the FID, other identifying information like IP address or device identifier is captured by the Pixel and transmitted to Facebook. Facebook categorizes this event as a "PageView," which indicates that the patient viewed the webpage.

**ANSWER:** Paragraph 100 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

101. Every time Defendant sends a patient's Website activity data to Facebook, that patient's personally identifiable information is also disclosed, including their FID. An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone can look up the user's Facebook profile and name.

**ANSWER:** Paragraph 101 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself.

The remaining allegations are denied.

102. A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

**ANSWER:** Paragraph 95 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

103. For example, a potential patient who is seeking in vitro fertilization treatment can choose the "Treatment" option on the Website that lists various options and then can click "In Vitro Fertilization."

**ANSWER:** In Response Paragraph 103 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

104. The first line of the highlighted text, "id:1033851220037921," refers to Defendant's Pixel ID for the Website and confirms that Defendant has downloaded the Pixel into its Source Code on this particular web page.

**ANSWER:** In Response Paragraph 104 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

105. In the line of text below, "ev:" is an abbreviation for event, and "PageView" is the type of event. Here, this event means that Defendant's Pixel is sending information about the webpage being viewed, which can include information like page title, URL and page description.

**ANSWER:** In Response Paragraph 105 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

106. The remaining lines of text identify the User as a patient: (i) seeking medical care from Defendant Chicago IVF via www.chicagoivf.com who is (ii) seeking "In Vitro Fertilization."

**ANSWER:** In Response Paragraph 106 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

107. Defendant's Pixel sends the communications the user made via the webpage to Facebook, and the image below confirms that the communications Defendant sends to Facebook contain the user's personally identifiable information.

**ANSWER:** Paragraph 107 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

108. The first line of highlighted text again identifies Defendant's Pixel ID and confirms that it implemented the Pixel into its source code for this webpage and transmitted info to Facebook from this webpage.

**ANSWER:** In Response Paragraph 108 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

109. The text ("GET"), at the top of the image, demonstrates that Defendant's Pixel sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (highlighted as the c_user ID in the image above) thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.

**ANSWER:** Paragraph 109 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

110. As Users move further into Chicago IVF's Website, Defendant continues to disclose User details through PageView events.

**ANSWER:** Paragraph 110 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

111. Defendant disclosed Users': (i) searches for specific doctors; (ii) fertility-related medical conditions; (iii) fertility treatments sought; (iv) patient status and (v) a user seeking an appointment.

**ANSWER:** In Response Paragraph 111 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

112. For example, Defendant shares details about whether a User wants to set up a video appointment with a medical professional. When a User navigates to the "Video Appointments" page, Defendant sends PageView events revealing that the User was attempting to make a video appointment:

**ANSWER:** In Response Paragraph 112 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

113. When a User searches for a doctor, Defendant also sends that information to Facebook through PageView events, including the specific doctor the patient is searching for.

**ANSWER:** In Response Paragraph 113 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

114. Finally, when a User schedules a consultation for fertility treatment at one of Defendant's facilities, the details regarding that consultation, including the fertility treatment being performed by Defendant, is transmitted to Facebook.

**ANSWER:** In Response Paragraph 114 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

115. Specifically, a "Lead" event, as shown in Figure 6, indicates to Facebook that "a

sign up is completed."

**ANSWER:** In Response Paragraph 115 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

116. In each of the examples above, the User's website activity and the contents of their communications are sent to Facebook alongside their PII. Several different methods allow marketers and third parties to identify individual Users, but the examples above demonstrate what happens when the website User is logged into Facebook on their web browser or device. When this happens, the Users' identity is revealed via third-party cookies that work in conjunction with the Pixels.

**ANSWER:** Paragraph 116 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

117. For example, the Pixel transmits the User's c_user cookie, which contains that User's unencrypted Facebook ID, and allows Facebook to link the User's online communications and interactions to their individual Facebook profile.

**ANSWER:** Paragraph 117 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

118. Facebook receives at least five cookies when Defendant's website transmits information via the Pixels, *see* Figure 7:

**ANSWER:** In Response Paragraph 118 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

119. The fr cookie contains an encrypted Facebook ID and browser identifier. Facebook,

at a minimum, uses the fr cookie to identify Users, and this cookie can stay on a User's website browser for up to 90 days after the User has logged out of Facebook.

**ANSWER:** In Response Paragraph 119 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

120. At each stage, Defendant also utilizes the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a User. *See* Figure 8:

**ANSWER:** In Response Paragraph 120 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

121. The Pixel uses both first and third-party cookies, and both were used on the Website.

**ANSWER:** In Response Paragraph 121 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

122. Defendant did not seek and did not have Plaintiffs' and Class Members' consent to share any of the sensitive Private Information described above.

**ANSWER:** Paragraph 122 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

***D. Chicago IVF's Use of the Pixels Violated Its Own Privacy Policies.***

123. Defendant's privacy policy represents to patients and visitors to its Website that it will keep their Personal Information, including their PHI, private and secure and that it will only disclose PHI provided to them under certain circumstances, none of which apply here.

**ANSWER:** In Response Paragraph 123 of the Complaint, ARHC states that the Privacy Policy speaks for itself. The remaining allegations are denied.

124. With respect to tracking technologies and analytics, Defendant's privacy policy

does not disclose to Users that it discloses their PHI and PII to third-parties, including Facebook.

**ANSWER:** In Response Paragraph 124 of the Complaint, ARHC states that the Privacy Policy speaks for itself. The remaining allegations are denied.

125. For example, Defendant Chicago IVF's Policy admits that it collects information about its Users but that "we will not sell your health information or provide any of your health information to any outside marketing company."

**ANSWER:** In Response Paragraph 125 of the Complaint, ARHC states that the Privacy Policy speaks for itself. The remaining allegations are denied.

126. Defendant Chicago IVF's privacy policy does not acknowledge that it collects IP addresses, cookies, and similar technologies.

**ANSWER:** In Response Paragraph 126 of the Complaint, ARHC states that the Privacy Policy speaks for itself. The remaining allegations are denied.

127. Patients and other Users of the Website are not informed about and have not consented to the disclosure of their Personal Information and their Website activity to a third party, including Facebook.

**ANSWER:** Paragraph 127 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

128. This is precisely the type of information for which HIPAA requires healthcare providers to utilize de-identification techniques to protect the privacy of patients.

**ANSWER:** Paragraph 128 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

129. Despite a lack of disclosure, Defendant allows Facebook to "listen in" on patients' confidential communications and to intercept and use for advertising purposes the very

information that it promises to keep private.

**ANSWER:** Paragraph 129 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

130. Defendant breached its own privacy policies by unlawfully permitting Facebook and likely other third parties to intercept Users' Private Information without obtaining patients' consent or authorization. Facebook then read, understood, and used that Private Information for its own business purposes—i.e., selling targeted advertising to Defendant (and other companies) which specifically targeted those Users based on their reproductive health conditions.

**ANSWER:** Paragraph 130 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

***E. Defendant Violated HIPAA.***

131. Defendant's disclosure of Plaintiffs' and Class Members' Private Information to entities like Facebook also violated HIPAA.

**ANSWER:** Paragraph 131 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

132. Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 132 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

133. Guidance from HHS instructs healthcare providers that patient status alone is

protected by HIPAA.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 133 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

134. HIPAA's Privacy Rule defines "individually identifiable health information" ("IIHI") as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 134 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

135. The Privacy Rule broadly defines protected health information as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 135 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

136. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the

individual or of relatives, employers, or household members of the individual are removed:

> A. Names
> …
> H. Medical record numbers;
> …
> J. Account numbers;
> …
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> P. Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 136 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

137. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 137 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

138. Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 138 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

139. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or

payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 139 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

140. Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 140 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

141. Here, as described *supra*, Defendant provided patient information to third parties in violation of the Privacy Rule—and its own Privacy Policy. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."

**ANSWER:** Paragraph 141 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Privacy Policy and Website speaks for itself. The remaining allegations are denied.

142. The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 142 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

143. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 143 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

144. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306I, and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Defendant failed to do.

**ANSWER:** Paragraph 144 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

145. Under HIPAA, Defendant may not disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. See HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

**ANSWER:** Paragraph 145 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC denies the allegations.

146. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c) Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d) Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e) Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3); and

f) Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

**ANSWER:** Paragraph 146 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

147. In disclosing the content of Plaintiffs' and Class Members' communications, Defendant had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions, that is, to illegally disclose Plaintiffs' and Class Members' Private Information to Facebook (and other Pixel Information Recipients) in violation of HIPAA, including 42 U.S.C. § 1320d-6(a)(3), as well as the torts alleged below.

**ANSWER:** Paragraph 147 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

148. Defendant intercepted the content of Plaintiffs' and Class Members' communications, including their Private Information, for a criminal and tortious purpose. Defendant would not have been able to obtain the Private Information or the marketing services it did if it had complied with the law.

**ANSWER:** Paragraph 148 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

***F. Users' Reasonable Expectation of Privacy***

149. Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

**ANSWER:** Paragraph 149 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

150. Indeed, when Plaintiffs and Class Members provided their Personal Information to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

**ANSWER:** Paragraph 150 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

151. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its

customers' data to be one of the most important privacy rights.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 151 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

152. For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 152 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

153. Personal data privacy and obtaining consent to share Private Information are material to Plaintiffs and Class Members.

**ANSWER:** Paragraph 153 of the Complaint is a statement of Plaintiffs' position to which no answer is required.. To the extent an answer is required, ARHC denies the allegations.

154. Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendant's status as healthcare providers, Defendant's common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express and implied promises of confidentiality.

**ANSWER:** Paragraph 154 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

### *G. Defendant was Enriched by & Benefitted from the Use of the Pixel & Other Tracking Technologies.*

155. Defendant decided to embed the Pixel and other tracking technologies on its Website with the purpose of disclosing Plaintiffs' and Class Members's communications to Facebook and other Pixel Recipients in order to improve marketing by creating campaigns that maximize conversions and thereby decrease costs to Defendant and boost their revenue.

**ANSWER:** In response to paragraph 155 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

156. After receiving individually identifiable patient health information communicated on Defendant's Website, Facebook analyzes this data, improves its own technology and business (including machine learning), and then forwards this data and analysis of this data, to Defendant.

**ANSWER:** Paragraph 156 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

157. Defendant then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

**ANSWER:** Paragraph 157 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

158. Facebook, as well, uses this data and analysis for its own commercial purposes, including to improve its platform and better understand the individuals that make up the audiences that its clients (advertisers) pay Facebook to target with ads.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 158 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

159. Defendant also receives an additional commercial benefit from using Facebook's

tracking tools, such as the Meta Pixel, in being able to serve more targeted advertisements to existing and prospective patients on their Meta accounts such as Facebook and Instagram.

**ANSWER:** Paragraph 159 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

160. Facebook advertises its Pixel as a piece of code "that can help you better understand the *effectiveness of your advertising* and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 160 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

161. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 161 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

162. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the tracking technologies and the Pixel embedded on, in this case, Defendant's Website.

**ANSWER:** In response to paragraph 162 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

163. For example, when a User searches for doctors, medical conditions or treatment on Chicago IVF's Website, that information is sent to Facebook. Facebook can then use its data on

the User to find more users to click on a Chicago IVF ad and ensure that the targeted Users are more likely to convert.

**ANSWER:** In response to paragraph 163 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

164. Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 164 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

165. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 165 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

166. In exchange for disclosing the Private Information of their account holders and patients, Defendant is compensated by Facebook (and other Pixel Information Recipients) in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

**ANSWER:** Paragraph 166 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

167. But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA compliant or are only HIPAA-compliant if certain steps are taken.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 167 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

168. For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 168 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

169. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 169 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

170. Whether a user has a Facebook profile is not indicative of damages because Facebook creates shadow profiles, and at least one court has recognized that the pixels' ability to track comprehensive browsing history is also relevant. *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1078–79 (N.D. Cal. 2021) (finding a reasonable expectation of privacy where Google combined the unique identifier of the user it collects from websites and Google Cookies that it collects across the internet on the same user).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 170 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

171. Upon information and good faith belief, Defendant retargeted patients and potential

patients, including Plaintiffs and Class Members.

**ANSWER:** In response to paragraph 171 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

172. Thus, utilizing the Pixels directly benefits Defendant by, among other things, reducing the cost of advertising and retargeting.

**ANSWER:** Paragraph 172 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

***H. Plaintiffs' Private Information has Financial Value.***

173. Plaintiffs' and Class Members' Private Information has value, and Defendant's disclosure and interception harmed Plaintiffs and Class Members by not compensating them for the value of their Private Information and, in turn, decreasing the value of their Private Information.

**ANSWER:** Paragraph 173 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

174. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 174 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

175. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 175 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

176. The robust market for Internet user data has been analogized to the "oil" of the tech

industry. A 2015 article from TechCrunch accurately noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge." That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 176 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

177. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs). That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 177 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

178. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 178 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

179. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users

for their data.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 179 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

180. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 180 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

181. Courts recognize the value of personal information and the harm when it is disclosed without consent.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 181 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

182. Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 182 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

183. Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 183 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

184. The value of health data is well-known and various reports have been conducted to

identify its value.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 184 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

185. Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 185 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

186. Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 186 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

187. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 187 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

188. Similarly, CNBC published an article in 2019 in which it observed that "[d]eidentified patient data has become its own small economy: There's a whole market of brokers

who compile the data from providers and other health-care organizations and sell it to buyers."

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 188 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

189. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 189 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

190. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 190 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

191. In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 191 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

192. Defendant shared Plaintiffs' and Class Members' communications and transactions on its Website without permission.

**ANSWER:** Paragraph 192 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

193. The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website Users,

including Plaintiffs and Class Members.

**ANSWER:** Paragraph 193 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

194. Plaintiffs have a continuing interest in ensuring that their future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**ANSWER:** Paragraph 194 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

**TOLLING**

195. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of the Meta Pixel into its website.

**ANSWER:** Paragraph 195 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

196. The Meta Pixel and other tracking tools on Defendant's website were and are entirely invisible to a website visitor.

**ANSWER:** Paragraph 196 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

197. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

**ANSWER:** Paragraph 197 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required,

ARHC states that the Website speaks for itself. The remaining allegations are denied.

198. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

**ANSWER:** Paragraph 198 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

199. Defendant had exclusive knowledge that its Website incorporated the Meta Pixel and other tracking tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by searching for and scheduling fertility treatment, Plaintiffs' and Class Members' Private Information would be disclosed or released to Meta and other unauthorized third parties.

**ANSWER:** Paragraph 199 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

200. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Private Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Private Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

**ANSWER:** Paragraph 200 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

201. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

**ANSWER:** Paragraph 201 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC denies the allegations.

202. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

**ANSWER:** Paragraph 202 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

203. Plaintiffs first discovered that Defendant had collected and shared their Private Information without her consent on or around August 2024 after contacting undersigned counsel and discussing potential claims against Defendant.

**ANSWER:** Paragraph 203 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

## CLASS ACTION ALLEGATIONS

204. **Class Definition:** Plaintiffs bring this action on behalf of themselves and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

**ANSWER:** In response to Paragraph 204, ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged.

205. The Nationwide Class that Plaintiffs seek to represent is defined as:

> All individuals residing in the United States who used Defendant's Website and had their Private Information shared with unauthorized third parties including, but not limited to, Facebook during the applicable statutory period.

**ANSWER:** In response to Paragraph 205, ARHC admits that Plaintiffs purport to bring

this case as a class action, but denies that this case is appropriate for class treatment as alleged.

206. The Illinois Sub-Class that Plaintiffs seek to represent is defined as:

> All individuals residing in Illinois who used Defendant's Website and had their Private Information shared with unauthorized third parties including, but not limited to, Facebook during the applicable statutory period.

**ANSWER:** In response to Paragraph 206, ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged.

207. Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

**ANSWER:** In response to Paragraph 207, ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged.

208. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

**ANSWER:** ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged. In addition, Paragraph 208 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

209. The Nationwide Class, and the Illinois Sub-Class are referred to collectively as the "Classes."

**ANSWER:** In response to Paragraph 209, ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged.

210. Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer

director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

**ANSWER:** In response to Paragraph 210, ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged.

211. Plaintiffs reserve the right to amend the definitions of the Class or Sub-class and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded or otherwise modified.

**ANSWER:** In response to Paragraph 211, ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged.

212. Numerosity/Ascertainability. Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time. However, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

**ANSWER:** ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged. In addition, Paragraph 212 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

213. Typicality. Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs used the Website and had their personally identifiable information and protected health information disclosed to Facebook without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

**<u>ANSWER</u>:** ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged. In addition, Paragraph 213 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

214. <u>Adequacy</u>. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Classes.

**<u>ANSWER</u>:** ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged. In addition, Paragraph 214 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

215. <u>Common Questions of Law and Fact</u>. Questions of law and fact common to the Classes predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Classes:

a. Whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

b. Whether Defendant had duties not to disclose Plaintiffs' and Class Members' Private Information to unauthorized third parties;

c. Whether Defendant violated its privacy policies by disclosing Plaintiffs' and Class Members' Private Information to Facebook, Meta, or other third parties;

d. Whether Defendant adequately, promptly and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been disclosed without their consent;

f. Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patient's Private Information;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private Information;

h. Whether Defendant knowingly made false representations or omitted material representations as to their data security and/or privacy policy practices;

i. Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices;

j. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

k. Whether Plaintiffs and Class Members are entitled to actual, consequential or nominal damages as a result of Defendant's wrongful conduct; and

l. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

**ANSWER:** ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged. In addition, Paragraph 215 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

216. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**ANSWER:** ARHC admits that Plaintiffs purport to bring this case as a class action, but denies that this case is appropriate for class treatment as alleged. In addition, Paragraph 216 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(1), *et seq.*
### (*On behalf of Plaintiffs & the Nationwide Class*)

217. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of themselves and the proposed Class.

**ANSWER**: In response to Paragraph 217 of the Complaint, ARHC incorporates by references its responses to Paragraphs 1-216 as if fully stated herein.

218. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 218 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

219. The ECPA protects both sending and receipt of communications.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 219 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

220. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 220 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

221. The transmissions of Plaintiffs' PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

**ANSWER:** Paragraph 221 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC denies the allegations.

222. Electronic Communications. The transmission of PII and PHI between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

**ANSWER:** Paragraph 222 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

223. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 223 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

224. Interception. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 224 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

225. Electronical, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 225 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

226. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Defendant and Meta use to track Plaintiffs' and the Class Members' communications;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing devices;

d. Defendant's web-servers and

e. The Pixels deployed by Defendant to effectuate sending and acquiring Users' and patients' sensitive communications.

**ANSWER:** Paragraph 226 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

227. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

**ANSWER:** Paragraph 227 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

228. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and

Class Members' electronic communications, for purposes other than providing health care services to Plaintiffs and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

**ANSWER:** Paragraph 228 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

229. Whenever Plaintiffs and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies it embedded and operated on its Website, contemporaneously and intentionally redirected and disclosed the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

**ANSWER:** Paragraph 229 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

230. Defendant's intercepted communications include, but are not limited to, the contents of communications to and/or from Plaintiffs' and Class Members' regarding PII and PHI, treatment, scheduling details and bill payments.

**ANSWER:** Paragraph 230 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

231. Additionally, through the above-described Tracking Technologies and intercepted communications, this information was, in turn, used by third parties, such as Facebook, to 1) place

Plaintiffs in specific health-related categories based on their past, present and future health conditions and 2) target Plaintiffs with particular advertising associated with Plaintiffs' specific health conditions.

**ANSWER:** Paragraph 231 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

232. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

**ANSWER:** Paragraph 232 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

233. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

**ANSWER:** Paragraph 233 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

234. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

**ANSWER:** Paragraph 234 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

235. Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

**ANSWER:** Paragraph 235 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

236. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Tracking Technologies.

**ANSWER:** Paragraph 236 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

237. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

**ANSWER:** Paragraph 237 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

238. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State, such as Illinois—namely, violations of HIPAA, among others.

**ANSWER:** Paragraph 238 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

239. Any party exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in

violation of the Constitution or laws of the United States or of any State.

**ANSWER:** Paragraph 239 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

240. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and/or interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

**ANSWER:** Paragraph 240 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

241. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing IIHI to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

**ANSWER:** Paragraph 241 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

242. Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI, and Defendant violated Plaintiffs' expectations of privacy, and constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Defendant used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to intercept and then disclose Plaintiffs' and Class Members' PII and PHI for financial gain.

**ANSWER:** Paragraph 242 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

243. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6**.**

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 243 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

244. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed IIHI to Facebook and Google without patient authorization.

**ANSWER:** Paragraph 244 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

245. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

**ANSWER:** Paragraph 245 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

246. Healthcare patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that cause

Facebook Pixels and other tracking codes (including but not limited to the fbp, ga and gid cookies) and other tracking technologies to be deposited on Plaintiffs' and Class Members' computing devices as "first-party" cookies that are not blocked.

**ANSWER:** Paragraph 246 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

247. The _fbp, ga, and cid cookies, which constitute programs, commanded Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

**ANSWER:** Paragraph 247 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

248. Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiffs' and Class Members' computing devices to remove, redirect, and disclose their data and the content of their communications with Defendant to Google, Facebook, and others.

**ANSWER:** Paragraph 248 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

249. Defendant's scheme or artifice to defraud in this action consists of: (a) the false and misleading statements and omissions in its privacy policy (HIPAA Notice) set forth above, including the statements and omissions recited in the claims below and (b) the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta.

**ANSWER:** Paragraph 249 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Privacy Policy and Website speaks for itself. The remaining allegations are denied.

250. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiffs' and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes and (b) to determine who has access to their computing devices.

**ANSWER:** Paragraph 250 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

251. As such, Defendant cannot viably claim any exception to ECPA liability.

**ANSWER:** Paragraph 251 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

252. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their IIHI (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, treatments, and medical bills) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' IIHI without providing any value or benefit to Plaintiffs or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' IIHI, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

**ANSWER:** Paragraph 252 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

253. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**ANSWER:** Paragraph 253 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

**COUNT II**

**NEGLIGENCE**
**(*On behalf of Plaintiffs & the Nationwide Class*)**

254. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of themselves and the proposed Class.

**ANSWER**: In response to Paragraph 254 of the Complaint, ARHC incorporates by references its responses to Paragraphs 1-253 as if fully stated herein.

255. Defendant owed Plaintiffs and Class Members a duty to keep their Private Information completely confidential, and to safeguard sensitive personal and medical information.

**ANSWER:** Paragraph 255 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

256. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

**ANSWER:** Paragraph 266 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

257. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Technologies to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including Private Information and the contents of such information.

**ANSWER:** Paragraph 257 of the Complaint contains legal conclusions to which no answer

is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

258. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

**ANSWER:** Paragraph 258 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

259. The third-party recipients included, but may not be limited to, Facebook and/or Google.

**ANSWER:** In response to paragraph 259 of the Complaint, ARHC states that the Website speaks for itself. The remaining allegations are denied.

260. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury; Nominal damages for each independent violation;

e. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

g. Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

h. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Private Information.

**ANSWER:** Paragraph 260 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

**COUNT III**

**UNJUST ENRICHMENT**
**(*On behalf of Plaintiffs & the Nationwide Class*)**

261. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of themselves and the proposed Class.

**ANSWER**: In response to Paragraph 261 of the Complaint, ARHC incorporates by references its responses to Paragraphs 1-260 as if fully stated herein.

262. This claim is pleaded in the alternative to Plaintiffs' other causes of action.

**ANSWER:** Paragraph 262 of the Complaint is a statement of Plaintiffs' position, to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

263. Defendant benefits from the use of Plaintiffs' and Class Members' Private

Information and unjustly retained those benefits at their expense.

**ANSWER:** Paragraph 263 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

264. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

**ANSWER:** Paragraph 264 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

265. Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used and disclosed this information for its own gain including for advertisement purposes, sale or trade for valuable services from third parties.

**ANSWER:** Paragraph 265 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

266. Plaintiffs and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

**ANSWER:** Paragraph 266 of the Complaint is a statement of Plaintiffs' position, to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

267. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other

benefits, including substantial monetary compensation.

**ANSWER:** Paragraph 267 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

268. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

**ANSWER:** Paragraph 268 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

269. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

**ANSWER:** Paragraph 269 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

270. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

**ANSWER:** Paragraph 270 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

271. The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods,

acts and trade practices alleged in this Complaint.

**ANSWER:** Paragraph 271 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

272. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**ANSWER:** Paragraph 272 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

**COUNT IV**

**Violation of the Illinois Eavesdropping Statute 720 ILCS § 5/14-1, *et seq*.**
**(*On Behalf of Plaintiffs & the Illinois Subclass*)**

273. Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of themselves and the proposed Illinois Subclass.

**ANSWER**: In response to Paragraph 273 of the Complaint, ARHC incorporates by references its responses to Paragraphs 1-272 as if fully stated herein.

274. The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, et seq., prohibits the surreptitious interception, recording, or transcription of private electronic communications without the consent of all parties to the conversation and provides a civil cause of action to a person subjected to a violation of the IES against eavesdroppers and their principals.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 274 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

275. Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent

of all parties to the private electronic communication.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 275 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

276. Under 720 ILCS § 5/14-2(a)(5), the IES makes it unlawful for a person to knowingly and intentionally use or disclose any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the IES, unless he or she does so with the consent of all of the parties.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 276 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

277. Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 277 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

278. The IES defines "private electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS § 5/14-1(e).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 278 to admit

or deny. To the extent any allegations are directed at ARHC, they are denied.

279. "Surreptitious," as used in the IES, "means obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS § 5/14-1(g).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 279 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

280. An "eavesdropper" means "any person…who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the IES] or who acts as a principal[.]" 720 ILCS § 5/14-1(b).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 280 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

281. A "principal" includes any person who "[k]nowingly derives any benefit or information from the illegal use of an eavesdropping device by another" or "[d]irects another to use an eavesdropping device illegally on his or her behalf." 720 ILCS § 5/14-1(c).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 281 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

282. An "eavesdropping device" is "any device capable of being used to…intercept…electronic communications[.]" 720 ILCS § 5/14-1(a).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 282 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

283. Plaintiffs' communications with Defendant constituted private electronic communications. Plaintiffs transmitted their communications to Defendant from their computer or wire, intended the communications to be private, and reasonably expected the communications to be private under HIPAA, Defendant's express promises of confidentiality, the physician-patient

relationship, and other State and federal laws protecting the confidentiality of Plaintiffs' communications.

**ANSWER:** Paragraph 283 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

284. Facebook and Google were not parties to Plaintiffs' private electronic communications with Defendant. Plaintiffs believed they were only communicating with Defendant, intended for their communications to be directed at Defendant only, and were unaware of the presence of concealed source code that redirected their communications.

**ANSWER:** Paragraph 284 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

285. Facebook and Google's interceptions of Plaintiffs' private electronic communications were knowing, intentional, and surreptitious. Facebook and Google intentionally designed their source code so that it could be concealed on websites to secretly intercept private communications. On information and belief, Facebook and Google knew that their source code was capable of, and in fact did, intercept private electronic communications without the consent of all parties to the communications.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 285 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

286. Facebook and Google used and disclosed Plaintiffs' intercepted communications for advertising purposes.

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 286 to admit

or deny. To the extent any allegations are directed at ARHC, they are denied.

287. Facebook and Google conduct was done without Plaintiffs' consent, in violation of 720 ILCS § 5/14-2(a)(3) and (a)(5).

**ANSWER:** There are no factual allegations directed at ARHC in Paragraph 287 to admit or deny. To the extent any allegations are directed at ARHC, they are denied.

288. Defendant acted as Facebook' and Google's "principal" under the IES. By deploying the source code from Facebook and Google on its Website, Defendant directed that Facebook and Google illegally eavesdrop on Plaintiffs' private electronic communications on its behalf and Defendant knowingly derived benefits and information from the illegal eavesdropping in the form of marketing.

**ANSWER:** Paragraph 288 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

289. Defendant further violated 720 ILCS § 5/14-2(a)(4) by possessing the source code, knowing that its design rendered it primarily useful for surreptitiously intercepting private electronic communications contrary to the IES.

**ANSWER:** Paragraph 289 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

290. Defendant' violation of the IES was wanton, reckless, and/or malicious.

**ANSWER:** Paragraph 290 of the Complaint contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC denies the allegations.

291. For Defendant' violations of the IES, Plaintiffs and Class Members seek actual

damages, punitive damages, injunctive relief, and any other relief the Court deems just.

**ANSWER:** Paragraph 291 of the Complaint is a statement of Plaintiffs' position, and contains legal conclusions to which no answer is required. To the extent an answer is required, ARHC states that the Website speaks for itself. The remaining allegations are denied.

**RELIEF REQUESTED**

292. Plaintiffs, on behalf of themselves and the proposed Class and Subclass, respectfully request that the Court enter an order:

a. Certifying this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class and Subclass defined above;

b. For equitable relief, enjoining Defendant from engaging in the unlawful practices and illegal acts described herein;

c. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

d. An award of damages, including but not limited to, (1) actual or statutory damages; (2) punitive damages in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5)reasonable attorney fees and expenses and costs of suit; and (6) such other and further relief as the Court may deem appropriate.

**ANSWER:** In response to paragraph 292, ARHC denies that Plaintiffs are entitled to any of the relief requested and denies every allegation not expressly admitted.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all claims asserted herein and so triable.

**ANSWER:** ARHC demands a jury trial and denies every allegation not expressly admitted.

## AFFIRMATIVE DEFENSES

ARHC asserts the following affirmative defenses, without assuming the burden of proof on such defenses that would otherwise fall on Plaintiffs. ARHC reserves the right to supplement or amend these defenses as discovery is conducted, and does not knowingly or intentionally waive any applicable affirmative defense.

### First Affirmative Defense

The Court lacks subject matter jurisdiction because Plaintiffs and the putative class members lack standing under Article III of the United States Constitution.

### Second Affirmative Defense

Plaintiffs and the putative class members fail to state a claim upon which relief can be granted.

### Third Affirmative Defense

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because their personally identifiable information and protected health information was not collected or transmitted to unauthorized parties without their consent.

### Fourth Affirmative Defense

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the applicable statute of limitations.

### Fifth Affirmative Defense

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because their reading of the ECPA and IES would be barred by the First Amendment of the United States Constitution.

**Sixth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the doctrine of intervening and/or superseding causation because any alleged injuries or damages they claim were caused by third parties who are not employees or agents of ARHC.

**Seventh Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because the acts, omissions, conduct, damages, loss, and/or injuries complained of were proximately caused by persons or entities other than ARHC.

**Eighth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because any alleged damages, injuries, or loss were caused and brought about by a prior or subsequent intervening and superseding cause for which ARHC had no responsibility or control over, by an unavoidable accident, by an act of God, or otherwise were substantially brought about by a cause or party not under the control of ARHC and therefore, ARHC is without fault.

**Ninth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole in part, because they have not suffered any injuries or incurred any damages.

**Tenth Affirmative Defense**

If Plaintiffs or the putative class members have been injured or damaged, they are barred from recovery, in whole or in part, by their failure to mitigate injuries and their failure to mitigate

damages.

**Eleventh Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because any injuries or damages resulted from their acts and/or omissions.

**Twelfth Affirmative Defense**

If Plaintiffs or the putative class members have been injured or damaged, any damage, loss, or liability sustained by Plaintiffs or the putative class members must be reduced, diminished, and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than ARHC under the principles of equitable allocation, recoupment, set-off, proportionate, responsibility, and comparative fault.

**Thirteenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the doctrine of waiver, estoppel, release, consent, and/or unclean hands.

**Fourteenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the collateral source doctrine.

**Fifteenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the voluntary payment doctrine.

**Sixteenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the failure to join one or more indispensable parties.

**Seventeenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the doctrine of election of remedies.

**Eighteenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because ARHC did not breach any alleged contractual, statutory, regulatory, common law, or any other alleged duty owed to Plaintiffs or the putative class members.

**Nineteenth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because ARHC complied with all applicable laws, regulations, rules, and statutes.

**Twentieth Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because ARHC did not act with intent to invade Plaintiffs' or the putative class members' alleged privacy.

**Twenty First Affirmative Defense**

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because ARHC did not retain any benefit related to the alleged personal information of Plaintiffs or the putative class members.

**Twenty Second Affirmative Defense**

Any claims of Plaintiffs and the putative class members against ARHC for punitive damages should be dismissed because an award of punitive damages would violate ARHC's Due Process rights as guaranteed by the United States Constitution and the Due Process provisions of the Constitutions of the State of Illinois, and any other applicable state.

**Twenty Third Affirmative Defense**

The Complaint fails to state sufficient facts to constitute a claim for recovery of attorneys'

fees.

**Twenty Fourth Affirmative Defense**

This lawsuit is improper for resolution on a class-wide basis because the putative class does not meet the requirements of Federal Rule of Civil Procedure 23.

**Twenty Fifth Affirmative Defense**

ARHC pleads any and all affirmative defenses contained in the Federal Rules of Civil Procedure which are supported by the facts, whether known or unknown at this time, as a complete or partial bar to the claims of Plaintiffs and putative class members.

**Twenty Sixth Affirmative Defense**

ARHC hereby reserves and asserts all affirmative and other defenses available under any applicable federal or state law. ARHC presently has insufficient knowledge or information upon which to form a believe as to whether it may have other, as yet unstated, affirmative defenses available. ARHC asserts the foregoing Affirmative Defenses without the benefit of discovery from Plaintiffs. ARHC therefore reserves the right to amend or supplement its Affirmative Defenses to the extent any additional defenses become available or apparent during the course of discovery and at any time, including up to and at trial.

**PRAYER FOR RELIEF**

ARHC prays for relief as follows:

1. For dismissal of Plaintiffs' and the putative class members' Complaint with prejudice and judgment entered in favor of ARHC;

2. That ARHC be awarded its costs of suit, including reasonable attorneys' fees;

3. For one hundred percent of any liability, responsibility, and/or fault for the injuries, losses, damages, if any, of Plaintiffs and the punitive class members be apportioned to them and/or

one or more third parties not before the Court;

4. For a trial by jury on all issues so triable; and

5. For such further and other relief as the Court deems fair and just.

Respectfully submitted,

**ADVANCED REPRODUCTIVE HEALTH CENTER, LTD. d/b/a CHICAGO IVF**

By: *__/s/ Jonathon J. Ibarra__*
One of its Attorneys

Ryan M. Neri (ARDC 6300419)
Jonathon J. Ibarra (ARDC 6309298)
Wood, Smith, Henning & Berman LLP
222 South Riverside Plaza - Suite 640
Chicago, Illinois 60606
rneri@wshblaw.com
jibarra@wshblaw.com